UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>NATURAL RESOURCES DEFENSE )<br>COUNCIL, INC., 1200 New York )<br>Ave., NW, Suite 400, Washington, )<br>DC 20005; DAKOTA RESOURCE )<br>COUNCIL, 113 W 1st Street, Dickinson, )<br>ND 58602; and DAKOTA RURAL )<br>ACTION, 910 4th St., Old Sanctuary )<br>Bldg., Suite A, Brookings, SD 57006, )<br> )<br>      Plaintiffs, )<br> )<br>      -v.- )<br> )<br>UNITED STATES DEPARTMENT OF )<br>STATE, 2201 C St., NW, Washington, )<br>DC 20520; CONDOLEEZZA RICE, )<br>in her official capacity as Secretary of )<br>State; REUBEN JEFFERY III, in his )<br>official  capacity as Under Secretary of )<br>State for Economic, Energy and )<br>Agricultural Affairs, )<br> )<br>      Defendants. )<br>_____ ) | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**<u>INTRODUCTION</u>**

1.      This case involves the federal permitting of the Keystone Pipeline Project

("Pipeline"), whose purpose is to transport heavy crude oil from Canadian tar sands to

terminals and refineries in the United States.  The prospect of the new Pipeline is

spurring refinery expansions and modifications that will lead to increased air and water

pollution for residents of the Midwest and other states.  Refining and other industrial

activities resulting from the Pipeline will also increase emissions of greenhouse gases that contribute to global warming and related harmful effects on the environment.

2.    Defendants are responsible under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), for assessing all reasonably foreseeable environmental impacts of the Pipeline, including direct, indirect, and cumulative effects, before granting a Presidential Permit for the Pipeline to cross into the United States. Although Plaintiffs and others repeatedly admonished Defendants that NEPA requires them to address (and, as warranted, to mitigate) the predictable increases in pollution from the refining of oil transported through the Pipeline, Defendants refused to consider these environmental impacts, and permitted the Pipeline without the benefit of this important information.  Defendants' limited view of their NEPA duties defeats the statute's dual goals to ensure informed government decisionmaking and to promote full public participation in actions that will significantly affect the human environment.

3.    Plaintiffs are non-profit organizations with members who live, work, and recreate near the refineries that will emit more air and water pollution as a direct consequence of Defendants' actions in permitting the Pipeline.  This added pollution will stem from both expanded refining operations and, to the extent it replaces oil from other sources, the more highly contaminated tar sands crude.  The pollution impacts, including cumulative impacts, may be particularly onerous to communities located near oil refineries, which are often burdened with contamination from multiple industrial sources.

4.    Plaintiffs' members will also be harmed by increases in greenhouse gases that will contribute to global warming and associated severe ecological disruption.

2

Greenhouse gas emissions from refineries will increase both because the Pipeline will lead to expanded operations and because, even to the extent tar sands crude is replacing existing sources of oil, refineries must expend more energy to process each barrel.

5.      Plaintiffs urge this Court to halt construction of the Pipeline and order Defendants to revoke the Presidential Permit until they properly address all significant environmental effects that are likely to result from the Pipeline, as required by law.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act ("APA")).

7.      Venue in this Court is proper under 28 U.S.C. § 1391(e), because all Defendants reside in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

Plaintiffs

8.      Plaintiff Natural Resources Defense Council, Inc. ("NRDC") is a national, not-for-profit membership corporation headquartered in New York City.  NRDC has more than 420,000 members nationwide, including over 19,000 members who live in Illinois, more than 2,900 who live in Kansas, and over 600 who live in South Dakota. NRDC is dedicated to the preservation, protection, and defense of the environment, public health, and natural resources.  Since its founding in 1970, NRDC has been actively involved in efforts to reduce air and water pollution from, and destruction of

natural lands by, industrial activity.  NRDC has also long been active in efforts to reduce greenhouse gas emissions that contribute to global warming.   NRDC has worked since its founding to ensure compliance with NEPA and other environmental laws.

9.     Dakota Resource Council ("DRC"), founded in 1978, is a nonprofit, grassroots activist organization with headquarters in Dickinson, North Dakota.  The mission of DRC is to form enduring, democratic local groups that empower people to influence decisionmaking processes that affect their lives.  DRC is committed to preserving sustainable agriculture and natural resources.  DRC's members include approximately 20 individuals and families in North Dakota who are members because of their concerns regarding natural resources and agriculture.  DRC members are specifically concerned about protection of water resources in North Dakota, and a majority of them own property in the Pipeline corridor.

10.     Dakota Rural Action ("DRA") is a statewide, grassroots membership organization dedicated to sustainable, family-based food systems, thriving rural communities, and natural resource conservation.  DRA builds leadership and successful campaigns that give people a voice in decisions that affect their lives.  DRA organizes South Dakotans to protect their family farmers and ranchers, natural resources, and unique way of life.  DRA has around 400 family and individual members representing over 500 South Dakotans.  Membership stretches across the state of South Dakota, including nearly every county.  Most DRA members live in communities of fewer than 10,000 people.

11.     On September 24, 2007, Plaintiffs NRDC and DRC submitted detailed comments to Defendants regarding the draft Environmental Impact Statement ("EIS")

for the Pipeline Project.  Among other issues, these comments discussed Defendants' failure to address adequately the pollution impacts of refining oil the Pipeline will transport.

12.    On February 11, 2008, Plaintiffs NRDC and DRC submitted detailed comments to Defendants regarding the final EIS for the Pipeline Project.  Among other issues, these comments discussed Defendants' continued failure to consider pollution impacts of refining oil transported by the Pipeline.

13.    Plaintiffs bring this action on behalf of their members who live, work, and recreate in areas that will be affected by increases in air and/or water pollution from refineries processing oil from the Pipeline, and by the deleterious impacts of increased emissions of greenhouse gases resulting from the Pipeline.  These members face increased risk of harm to their health, recreational, economic, and aesthetic interests as a result of Defendants' actions in permitting the Pipeline without adequate environmental review.  Defendants' failure to provide required information and analyze and/or mitigate reasonably foreseeable direct, indirect, and cumulative impacts of the Pipeline has further deprived Plaintiffs' members of their legal rights to participate fully in the process leading to permitting of the Pipeline.  The declaratory and injunctive relief Plaintiffs seek under NEPA will redress the injuries to Plaintiffs' members, by requiring Defendants to consider fully and provide to the public and other government decision-makers complete information about the anticipated environmental and public health impacts resulting from the Pipeline, and to take steps as warranted to minimize or avoid those impacts.

Defendants

14.     Defendant United States Department of State is a federal agency responsible for foreign affairs, whose chief administrator is the Secretary of State.  In carrying out its responsibilities, the Department must comply with applicable requirements of NEPA and the APA.

15.     Defendant Condoleezza Rice is the Secretary of State.  In her official capacity, Secretary Rice is responsible for issuing permits with respect to certain energy related facilities on the international boundaries of the United States, including the Pipeline.  In carrying out these duties, Secretary Rice must ensure compliance with the requirements of NEPA and the APA.

16.     Defendant Reuben Jeffery III is the Under Secretary of State for Economic, Energy and Agricultural Affairs.  Defendant Secretary Rice has delegated to Under Secretary Jeffery responsibilities related to authorizing the Pipeline.  In his official capacity, Under Secretary Jeffery signed the Presidential Permit for the Pipeline and the Record of Decision authorizing the Presidential Permit.  In carrying out his duties, Under Secretary Jeffery must ensure compliance with the requirements of NEPA and the APA.

17.     "DOS" as used below refers collectively to all Defendants.

## STATUTORY AND REGULATORY BACKGROUND

National Environmental Policy Act

18.     One core purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  It is the "basic national charter for" environmental protection.  40 C.F.R. § 1500.1.  Among the statute's goals are to "insure that environmental information is available to public officials and citizens

*before decisions are made and actions are taken*"; and to "help public officials make

decisions that are based on [an] understanding of environmental consequences, and

take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(b)-(c)

(emphasis added).

19.    To achieve these objectives, NEPA requires all agencies of the federal

government to prepare a "detailed statement" regarding all "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

This statement – the EIS – must describe, among other things:  (1) the environmental

impact of the proposed action, and (2) any adverse environmental effects that cannot be

avoided should the proposal be implemented.  *Id.* § 4332(2)(C)(i), (ii).

20.    The Council on Environmental Quality ("CEQ"), established under NEPA

within the Executive Office of the President to be responsible for coordinating federal

environmental efforts, has promulgated regulations implementing NEPA.  40 C.F.R.

§§ 1500-1508.  DOS's own NEPA regulations, which incorporate and supplement the

CEQ regulations, are set forth at 22 C.F.R. §§ 161.1-161.12.

21.    Pursuant to CEQ regulations, an EIS must include, among other things:

(1) a "full and fair discussion" of the significance of all "direct," "indirect," and

"cumulative" effects of the action, 40 C.F.R. §§ 1502.1, 1502.16(a)-(b), 1508.25(c); and

(2) a discussion of "means to mitigate adverse environmental impact."  *Id.* § 1502.16(h).

22.    "Direct effects" are caused by the action and occur at the same time and

place.  40 C.F.R.  § 1508.8(a).  "Indirect effects" are reasonably foreseeable effects

caused by the action, but later in time or farther removed in distance.  *Id.* § 1508.8(b).

These may include "growth inducing effects and other effects related to induced

23.     A "cumulative impact" is defined as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency . . . or person undertakes such other actions."  *Id.* § 1508.7.  Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*

24.     CEQ regulations also require decisionmakers to address, in a single EIS, all "connected," "closely related," actions.  *Id.* § 1508.25(a)(1).  These actions are defined in the CEQ regulations as those that "(i)[a]utomatically trigger other actions which may require environmental impact statements"; "(ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously"; and/or "(iii) [a]re interdependent parts of a larger action and depend on the larger action for their justification."  *Id.*

25.     NEPA directs federal decisionmakers to "recognize the worldwide and long-range character of environmental problems . . . ."  42 U.S.C. § 4332(2)(F).

26.     When an agency is evaluating reasonably foreseeable significant adverse impacts in an EIS and there is incomplete or unavailable information that cannot be obtained, the EIS must at least (1) state that such information is incomplete or unavailable; (2) state the relevance of the information to evaluating reasonably foreseeable significant impacts; (3) summarize existing credible scientific evidence that is relevant to evaluating those impacts; and (4) evaluate such impacts based upon

theoretical approaches or research methods generally accepted in the scientific community.  40 C.F.R. § 1502.22(b).  If the information is essential to a reasoned choice among alternatives, and can be obtained without exorbitant costs, the agency must include the information in the EIS.  *Id.* § 1502.22(a).

27.     An agency must first prepare a draft EIS that satisfies to the fullest extent possible the final EIS requirements of 42 U.S.C. § 4332(2)(C).  40 C.F.R. § 1502.9(a).  After preparing the draft EIS and before preparing a final EIS, the agency must solicit comments from the public, "affirmatively soliciting comments from those persons or organizations who may be interested or affected."  *Id.* § 1503.1(a).

28.     After the public comment period, an agency must prepare a final EIS based on its assessment and consideration of the comments received from the public, as well as other relevant Federal, State and local agencies, on the draft EIS.  *Id.* § 1503.4(a).  An agency must respond to comments by such means as modifying alternatives; developing and evaluating new alternatives; supplementing, improving, or modifying its analyses; making factual corrections; and/or explaining in detail why the comments do not require further response.  *Id.* § 1503.4(a); *see also id.* § 1502.9(b).

Executive Order 13337

29.     Executive Order 13337 of April 30, 2004 (69 Fed. Reg. 25299), as amended, delegates to the Secretary of State the President's authority to receive applications for permits for the construction, connection, operation, or maintenance of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels at the border of the United States and to issue or deny such permits upon a determination that the action to be permitted serves the national interest.

30.     By Department of State Delegation of Authority No. 118-2 of January 26, 2006, the Secretary of State delegated authority to issue Presidential Permits pursuant to Executive Order 13337 to the Under Secretary of State for Economic, Energy and Agricultural Affairs.

Administrative Procedure Act

31.     The APA governs judicial review of an agency's compliance with NEPA. A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTS

Environmental Impacts of Refining Canadian Tar Sands Crude

32.     The Pipeline will supply U.S. refineries with extra heavy sour crude oil extracted from Canadian tar sands.  Some of this heavy crude oil will replace supplies of "conventional" light crude oil, while some of it will represent additional supplies to meet projected increasing demands for oil in the United States.

33.     According to a 2007 U.S. Geological Survey report, the type of oil extracted from Canadian tar sands contains eleven times more sulfur, six times more nitrogen, eleven times more nickel, and five times more lead than conventional oil.

34.     Refining tar sands crude transported through the Pipeline will likely result in higher air emissions of harmful pollutants such as sulfur dioxide, hydrogen sulfide, sulfuric acid mist, and nitrogen oxides, as well as toxic metals such as lead and nickel compounds.

35.    According to the U.S. Environmental Protection Agency ("EPA"), the human health effects of these pollutants may include premature death; cancer; permanent lung damage; reproductive, neurological, developmental, respiratory, and immunological problems; cardiovascular and central nervous system disorders; bio-mutations; respiratory illness, including bronchitis and pneumonia; and aggravation of heart conditions and asthma.

36.    Also according to EPA, the environmental damage caused by these pollutants includes acid rain; concentration of toxic chemicals up the food chain; creation of ground-level ozone and smog; visible impairments that migrate to sensitive areas such as National Parks; and depletion of soil nutrients.

37.    Refining oil transported by the Pipeline can be expected to produce more greenhouse gases, such as carbon dioxide, than refining conventional crude oil, because the tar sands crude requires more energy to refine.  The requisite additional energy is most likely to come from sources, such as coal-fired power plants, that emit large quantities of greenhouse gases.  This will add to harmful emissions emanating from the refineries themselves.

38.    Further, the Pipeline is intensifying development of Canadian tar sands, which results in increased emissions of greenhouse gases from the energy-intensive extraction process, as well as associated activities such as destruction of forests.

39.    Greenhouse gases, such as carbon dioxide, contribute to global warming and a wide range of related adverse ecological and human health effects, including both water shortages and coastal flooding, increased risk of wildfires and stronger hurricanes, new pests and insect-borne diseases, and disruption of habitats.

40.    Refineries processing Canadian tar sands crude from the Pipeline are likely to increase discharges of water pollutants, including ammonia and total suspended solids, which may damage surrounding waterways.  Refinery construction and expansion may also compromise or destroy wild or agricultural lands.

41.    Compliance with existing air pollution and water pollution laws will likely not prevent increases in air and water pollution.  For example, both the federal Clean Air Act and the federal Clean Water Act exempt from applicable permit limits so-called "upsets," which can result in releases of excess pollutants, notwithstanding those limits. In addition, some of the refineries processing oil from the Pipeline will be in so-called "attainment" areas where total air emissions may lawfully be increased, but even these "legal" emissions may have harmful impacts.  Finally, the Clean Air Act does not currently control emissions of carbon dioxide or other greenhouse gases from refineries.

42.    Local and regional effects of increased air and water pollution will harm Plaintiffs' members who live, work, and recreate in the vicinity, downwind, and downriver of the refineries processing oil from the Pipeline, while the impacts of increased releases of greenhouse gases, including releases attributable to activities occurring in Canada, will be experienced by a broader group of Plaintiffs' members.  Some refineries that will process oil from the Pipeline are in areas that are already heavily polluted from other local sources, including existing oil refineries.  Adverse cumulative environmental effects in such areas may be significant.

Background of the Pipeline Project and Its Approval by DOS

43.    On April 19, 2006, TransCanada Keystone Pipeline LLC ("Keystone"), filed an application with DOS for a Presidential Permit for the construction, connection,

operation, and maintenance of pipeline facilities for the transport of crude oil across the U.S.-Canadian border.

44.     The stated purpose of the Pipeline is to transport heavy crude oil from Canadian tar sands for refining in the United States.

45.     The first portion of the Pipeline, known as the "Mainline Project," consists of over 1,000 miles of pipeline in the United States, traversing portions of North Dakota, South Dakota, Nebraska, Kansas, Missouri, and Illinois.  The Mainline Project will deliver oil to an existing crude oil refinery in Wood River, Illinois, and to an existing crude oil terminal in Patoka, Illinois.

46.     A planned extension, known as the "Cushing Extension," will consist of nearly 300 miles of pipe extending from Steele City, Nebraska, through Kansas, to Cushing, Oklahoma.  The Cushing Extension will interconnect with other, existing crude oil pipelines that supply refinery markets in Cushing, Oklahoma and the U.S. Gulf Coast.

47.     According to the final EIS, the Pipeline will deliver approximately 435,000 barrels of crude oil per day ("bpd") from Canada to oil terminals and refineries in the U.S. Midwest and Gulf regions.  The addition of supplemental pumping capacity can increase the daily throughput in the Pipeline to approximately 591,000 bpd.

48.     According to the final EIS, much of the oil from the Pipeline initially will be refined at ConocoPhillips' Wood River Refinery in Wood River, Illinois.  The Wood River Refinery is planning a major capital expansion because the Pipeline will increase both the refinery's total crude processing capacity and the percentage of heavy crude oil

processed there.  As the final EIS acknowledges, however, the Wood River Refinery is not the only refinery that will be processing oil from the Pipeline.

49.    As the lead agency, DOS is responsible for conducting all environmental reviews for the entire Pipeline project, under NEPA and other statutes.

50.    On August 10, 2007, DOS released a Draft EIS for the Pipeline.  While the draft EIS contained a very brief discussion of the Wood River Refinery, DOS did not fully analyze the reasonably foreseeable significant environmental effects of refining Pipeline-transported oil at the Wood River facility.

51.    The draft EIS contained no information at all about reasonably foreseeable significant environmental impacts of the Pipeline at any other refinery.  Nor did the Draft EIS contain any discussion of cumulative impacts, greenhouse gas emissions, or means to mitigate any indirect or cumulative adverse impact the Pipeline will generate or to which it will contribute.

52.     Plaintiffs and others submitting comments on the draft EIS noted DOS's failure to address the environmental impacts of the Pipeline with regard to the issues identified in the preceding paragraphs.

53.    On January 11, 2008, DOS released a final EIS for the Pipeline.  Again, except for a cursory, inadequate discussion of impacts from the Wood River Refinery, DOS failed to address at all the pollution effects of processing oil from the Pipeline at any refinery, either specifically or in more general terms.  Nor did DOS address global warming impacts related to extracting Pipeline oil from tar sands or refining it downstream.  With regard to global warming impacts from refining tar sands crude at Wood River, DOS noted only EPA's opinion that, for the present, permitting under the

Clean Air Act is not an appropriate vehicle for addressing climate change concerns.
DOS did not discuss any means to mitigate global warming impacts from refining oil
conveyed by the Pipeline.

54.     In Appendix A to the final EIS, DOS, as required by NEPA, responded to
comments on the draft EIS.  In response to a comment from Plaintiffs that raised the
issue of increased local pollution and greenhouse gas emissions due to the refining of
tar sands crude oil, DOS stated (emphasis supplied):  "The D[raft] EIS addresses the
reasonably foreseeable environmental impacts of the construction and operation of the
proposed Keystone Pipeline within the United States and is *limited to the pipeline which
is a transportation system.  The scope of the EIS* is necessarily limited to the scope of
the proposed project and *does not extend to the supply of crude oil to the transportation
system or the operation of refineries that are supplied by it*."

55.     DOS made the same or similar statements in response to other comments
raising the issues of environmental impacts from refining, cumulative impacts, and
global warming impacts of extraction.

56.     In response to a comment from Plaintiffs that raised the issue of
environmental impacts of refinery expansions planned or undertaken to refine the
expanded amount of tar sands oil conveyed by the Pipeline, DOS noted its discussion
of the Wood River Refinery, opined that impacts associated with other refineries "would
be extremely difficult to quantify," and concluded:  "It is purely speculative to identify any
refinery other than Wood River that is reasonably certain to process Keystone crude
oil."

57.    DOS responded in the same vein to other comments from Plaintiffs about cumulative impacts from upgrading tar sands crude oil, and to comments about public health impacts from increased pollution in local communities near refineries being modified because of the Pipeline.

58.    In response to a comment from Plaintiffs that raised the issue of increased conventional air pollutants and carbon dioxide due to the extra energy needed to refine tar sands crude oil, DOS noted its Wood River discussion, then stated:  "Other refineries that would receive oil from the Keystone pipeline would be held to air emissions requirements of their existing air quality permits."

59.    In response to a comment from Plaintiffs that raised the issue of increased water pollution from refinery expansions, DOS noted only its discussion of Wood River impacts.

60.    On February 28, 2008, DOS issued a Record of Decision ("ROD") to issue a Presidential Permit for the Pipeline, along with a determination that issuance of the permit would serve the national interest.  The ROD did not supply any meaningful additional environmental information or analysis, but rather relied on DOS's deficient final EIS.

61.    On March 11, 2008, DOS issued the Presidential Permit authorizing the Pipeline to cross the U.S.-Canadian border.

Relation between Refineries and Pipeline

62.    While the final EIS contains no information on the environmental impacts resulting from the refining of oil from the Pipeline at refineries other than Wood River,

there was ample evidence before the EIS was issued of likely ties between the Pipeline and other, identifiable refineries.  For example:

(a) In its 2007 Annual Report, the National Cooperative Refinery Association, which operates a refinery in McPherson, Kansas, stated that it had entered into a ten-year agreement with Keystone for 20,000 bpd of Pipeline oil, in conjunction with a study assessing the refinery's ability to process additional heavy Canadian crude.

(b) In a 2007 filing with the Securities and Exchange Commission, CVR Energy, Inc., which owns a single refinery in Coffeyville, Kansas, supplied in part by a pipeline from Cushing, Oklahoma, reported that it had entered into a ten-year contract with Keystone for at least 25,000 bpd to be delivered to Cushing, while also reporting steadily increasing volume of oil processed at the refinery.

(c) In 2006 testimony before the Illinois Commerce Commission, a consultant hired by Keystone addressed the need for the Pipeline.  In conjunction with stating that the Pipeline would deliver its oil to Wood River and Patoka, Illinois, the consultant noted that ConocoPhillips operates a pipeline from Wood River to its refinery in Ponca, Oklahoma, and that oil delivered to Patoka could be transported from there to four other refineries in southern Illinois, Indiana, Ohio, and Kentucky.  In particular, the consultant singled out a Marathon refinery in Robinson, Illinois to be supplied by the Pipeline.  The Marathon refinery is in the process of considering a full conversion to Canadian heavy crude.

(d) A new Hyperion refinery proposed for Elk Point, South Dakota is close to the path of the Pipeline.  In the fall of 2007, a Keystone spokesman stated that, although there was no relationship at that time between the Hyperion refinery and the

Pipeline, Keystone was always looking for new customers, it could increase Pipeline capacity, and a spur line of approximately thirty miles to meet the Hyperion refinery was possible.

63.    The information in the previous paragraph, along with other information available to DOS, should have allowed DOS to address in the final EIS the significant environmental impacts of refining Pipeline-transported oil at facilities other than Wood River.

64.    DOS failed to consider adequately the Pipeline's indirect effects at Wood River, and failed to consider at all its indirect effects at any other refinery.  DOS did so despite the fact that the purpose of the Pipeline is to convey Canadian tar sands crude to refineries downstream.  Without downstream refining, there is no purpose to the Pipeline, and no national interest in its construction.

65.    DOS failed to assess the Pipeline's cumulative impacts, recognize the broader and longer-range problems its global warming-inducing effects may pose, address incomplete or unavailable information concerning reasonably foreseeable and significant adverse project-related impacts, or consider or propose appropriate mitigation measures.

66.    Defendants approved the Presidential Permit for the Pipeline in reliance on the deficient final EIS they prepared.

## **CLAIM FOR RELIEF**

67.    Plaintiffs incorporate herein the allegations of paragraphs 1-66 above.

68.    Defendants failed to include in the draft EIS and final EIS for the Pipeline a full and fair discussion of the significant direct, indirect, and cumulative environmental effects of the action it approved, in violation of NEPA.

69.    Defendants failed to include in the draft EIS and final EIS for the Pipeline a full and fair discussion of the effects of all actions "connected" or "closely related" to the action it approved, in violation of NEPA.

70.    Defendants failed to include in the draft EIS and final EIS for the Pipeline a sufficient discussion of means to mitigate adverse environmental impacts, in violation of NEPA.

71.    Defendants failed to comply with NEPA with respect to analyzing impacts as to which there may be unavailable or incomplete information.

72.    Defendants failed to respond adequately under NEPA to comments on the draft EIS from Plaintiffs and others.

73.    Defendants approved the Presidential Permit for the Pipeline based on a final EIS that did not comply with NEPA.  Accordingly, the approval is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA.

74.    Unless and until DOS prepares a full EIS that considers all of the Pipeline's reasonably foreseeable, significant direct, indirect, and cumulative impacts on human health and the environment; identifies mitigation to address such impacts; and then rules on Keystone's permit application in a fully informed, reasoned manner, Plaintiffs will suffer irreparable harm.

75.    Plaintiffs have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court enter a judgment:

(1)  declaring that DOS's failure to prepare a sufficient EIS before issuing the Presidential Permit violates NEPA;

(2) declaring that DOS's issuance of the Presidential Permit based on an insufficient EIS violates the APA;

(3)  directing DOS to revoke the Presidential Permit, to require Keystone to remove the portion of the Pipeline subject to the Presidential Permit, and to ensure that no further activity in furtherance of Pipeline construction or operation is undertaken unless and until DOS complies fully with the requirements of NEPA and the APA;

(4)  awarding Plaintiffs their costs and reasonable attorneys' fees incurred in prosecuting this action; and

(5)  ordering such other relief as the Court may deem just and proper.

Dated:  Washington, D.C.
       August 6, 2008

Respectfully submitted,

Aaron Colangelo (D.C. Bar # 468448)
Natural Resources Defense Council, Inc.
1200 New York Avenue, N.W., Suite 400
Washington, D.C. 20005-6166
Phone:        (202) 289-2376
Fax:            (202) 289-1060

Mitchell S. Bernard
Nancy S. Marks
Aaron Bloom
Natural Resources Defense Council, Inc.
40 West 20th Street
New York, NY 10011

Phone:        (212) 727-2700
Fax:          (212) 727-1773

Selena K. Kyle
Natural Resources Defense Council, Inc.
111 Sutter Street, 20th floor
San Francisco, CA 94104
Phone:        (415) 875-6158
Fax:          (415) 875-6161

Counsel for Plaintiffs Natural Resources Defense
Council, Inc., Dakota Resource Council, and Dakota
Rural Action


Carrie La Seur
Plains Justice
100 First Street SW
Cedar Rapids, IA 52404
Phone:        (319) 362-2120
Fax:          (866) 484-2373

Counsel for Plaintiffs Dakota Resource Council and
Dakota Rural Action

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

NATURAL RESOURCES DEFENSE COUNCIL, INC., DAKOTA RESOURCE COUNCIL, and DAKOTA RURAL ACTION

## DEFENDANTS

UNITED STATES DEPARTMENT OF STATE, CONDOLEEZZA RICE, in her official capacity as Secretary of State, and REUBEN JEFFERY III, in his official capacity as Under Secretary of State for Economic, Energy and Agricultural Affairs

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____ 88888 _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)** _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Aaron Colangelo (D.C. Bar No. 468448)
Natural Resources Defense Council
1200 New York Ave NW, Suite 400
Washington, DC 20005
Phone: (202) 289-2376

ATTORNEYS (IF KNOWN)

Not known.

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/* *2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

National Environmental Policy Act, 42 U.S.C. § 4321 et seq.; and Administrative Procedure Act, 5 U.S.C. § 701-705; agency action on insufficient EIS

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Check YES only if demanded in complaint    JURY DEMAND:    YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐   NO ☒    If yes, please complete related case form.

DATE 8/06/2008    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.